Minshall, C. J.
The statute upon which the complaint in this case was made and the conviction had, is section 2, of an act to prevent the adulteration of vinegar, as amended April 14, 1888 (85 Laws, 259), and reads as follows: “No person shall manufacture for sale, or knowingly offer for sale, or have in his possession with intent to sell, any vinegar found upon proper test to contain any preparation of lead, copper, sulphuric acid, or other ingredients injurious to health, or containing artificial coloring matter. ’ ’ A violation of the act is, by the fifth section, made an offense, punishable by fine or imprisonment, or both.
The only question in the ease, aside from the validity of the law, is, whether the finding of the justice is supported by the evidence; and in this court, that question is limited to whether there was any evidence tending to support the material averments of the complainant. Such is the rule in all other cases; and no reason is perceived why this ease should form an exception to it. The charge was that on December 11, 1894, the defendant knowingly had in his possession a quantity of vinegar, found on proper test to contain artificial coloring matter. The possession of the vinegar and the intent to sell, were admitted, but he denied that it contained artificial coloring matter; and this is the only question on which an issue of fact was taken at the trial.
Prof. Fennel, an analytical chemist called by the state, testified that from an analysis made by him, the vinegar in question contained artificial coloring *85 matter; that it was of a “turbid brown color;” that the analysis indicated “burnt sugar,” and could have been introduced for no other purpose than to give color to the vinegar. On cross examination he said, if roasted malt had been used in the manufacture of the vinegar, it could have had no other result than to give color, but admitted that if used in large proportions it might give aroma. He explained that roasted malt is not what is known in commerce as caramel — a coloring-matter, but said that practically it is the same thing. That in roasting, the sugar of the malt is converted into caramel, or burnt sugar, and serves as a coloring matter thus derived from the roasted malt.
The defendant, Weller, was called as a witness in his own behalf, and explained the process by by which he made the vinegar. He said that corn, malt and rye in certain proportions are ground into meal, then put into a mash tub and cooked with steam for an hour and a half. It is then run through cooling pipes, and discharged into fermenting tanks and allowed to ferment for a week; it is then distilled into weak alcohol, or, as it is termed, low-wine; it is then run through a tank filled with roasted malt; and then through generators containing beech shavings. In this way it is acetified or converted into vinegar. The purpose, he said, of adding- the roast malt was to give it an aroma and flavor that nothing else would give it. He also admitted it gave'color to the vinegar; that without the addition of the roast malt, the vinegar would be white, or about the color of alcohol. It was not contended that the roast malt added anything to the vinegar other than aroma, flavor and color. The vinegar so manufactured *86 resembles malt vinegar, and was labeled and sold by the defendant as such, but it is not malt vinegar. The latter is made by the process of fermentation only. It derives its color and flavor from the fermented malt, and not otherwise, no artificial means being used for the purpose, and requires a much longer time in which to make it — being from four to six months. That of the defendant is known as distilled vinegar, does not require more than a week in its manufacture, and but for the introduction of the roasted malt, after the distillation of the fermented malt and before its acetiflcation by passing through the beech shavings, would have neither the aroma, flavor, nor color of malt vinegar. There is no material difference in the testimony on this point. Prof. Hoffman, an analytical chemist, called by the state, substantially corrobated the evidence given by Prof. Fennel as to the effect and purpose of using roasted malt in the manufacture of distilled vinegar. It would give color, and, if used in large proportions might give some aroma and flavor.
Prof. Schmidt, an analytical chemist, called by the defendant, testified from an analysis made by him, that he found no evidence of artificial coloring- matter in the vinegar. He did, however, find evidence of roasted malt having- been used. This he did not regard as a coloring matter; but was driven to admit that it not only added aroma and flavor, but also color; and that if this roasted malt had been added to the product before distillation, it would have added neither flavor, aroma nor color, and the distillation would have been perfectly white. A g-ood deal of criticism was indulged in as to what roasted malt, as used by the defendant in his process of manufacturing vinegar, should *87 be called, whether caramel, burnt sugar or converted sugar. He regarded it more properly as “inverted sugar. ” But it was not a question of terminology, but as to its effect as a coloring matter; and, as to this, there was little or no difference of opinion among the witnesses. It was conceded that there is no alcohol in browned or roasted malt, so that its addition could add nothing to the substantial ingredients of the- vinegar — the vineg’ar being’ a solution of acetic acid, produced by the acetifieation of the alcohol in passing through the beech shavings. On being recalled, Prof. Fennel said, that as there is no alcohol in roasted malt, the object in using it is simply coloring matter; and that every chemist would say so; and, on' being told by the attorney for the defendant, that Prof. Schmidt did not say so, he replied, “Well, he will not deny it. ” And it is worthy of notice that he was not recalled to do so. In view of this testimony it cannot, I think, be said that there is no evidence tending- to support the conviction of the defendant; on the contraiy, it seems fully to support the finding of the justice.
But it is claimed that the primary object of using roasted malt is to give aroma and flavor to the vinegar, and that color is simply an incident to the process adopted in attaining the primary end; and hence that the giving of color in this way, cannot be said to come within the meaning of the statute. But the evidence tends to show that the primary object was to give color. His purpose in using the roasted malt was a question of fact to be determined by the court trying the case. His statement as to his purpose cannot control the court, if, in view of all the evidence, the. court is satisfied that his real and principal purpose was to give *88 color to tlie vinegar. Again, if the primary object was to give aroma and flavor, still the process adopted for this purpose was an artificial one. Distilled vinegar, as is that of the defendant, has no such aroma; it is given, if at all, by the artificial method of running the distillation through roasted malt, before its aeetification, and artificial coloring is one of the principal results; and, in such case, it is not material whether color or aroma was the primary object, both being attained by artificial means. The process adds no substantial ingredients to the vinegar; for neither aroma, flavor nor color can be said to be substantial ingredients of any product. The}^ are not susceptible of analysis, and are merely perceived' by the aid of the senses.
The plaintiff in error in support of his contention, relies largely upon Ammon v. Newton, 50 N. J. L., 543. The case arose upon a conviction of Ammon under a statute of that state, making it an offense for any one to have in his possession for the purpose of sale, “oleomargarine that is colored, stained or mixed with annotto, or any other coloring matter or substance'.” It appeared by the plea of the defendant, and was admitted by the state, that cotton seed oil, a nutritious vegetable substance, formed about one-fifth of the product called oleomargarine, and was used in its manufacture, not simply for the purpose of coloring the product, but as one of its substantial ingredients. The court, applying the rule noseitur a sociis, held that the language “or other coloring-matter” extends . only to coloring substances that resemble “annotto;” substances used merely, or chiefly, for the same purpose, annotto being used only as a coloring matter; and that “the language cannot *89 with propriety, be interpreted so as to include materials employed chiefly to make up the substance of the compound, and which impart some color only as a necessary incident of their use.” The ease is clearly distinguishable from the one before us. Our statute inhibits the possession for the purpose of sale, of any vinegar containing artificial coloring matter; and is therefore broader than the New Jersey statute as to oleomargarine. And, again, as shown, the roasted malt in this case, was used not as a substantial ingredient, but only to give color, flavor or aroma, neither of which are substantial ingredients of the vinegar.
The construction asked to be given this statute would permit a manufacturer to run distilled vinegar through roasted apples, and, by thereby imparting to it the color and aroma of cider vinegar, sell it in the market as such. And this, we understand, was claimed in the court below. But the purpose of this statute was, we think, to protect the public against such deceptions. Much is claimed from the fact that it was admitted on the trial that the vinegar of the defendant was whole-; some, and that he did not intend to deceive anyone by using the roasted malt, and labeling and selling his product as “Malt Vinegar.” But this is wholly immaterial. It matters not what his intentions may have been. The tendency of such devices is to deceive the public; and the statute was enacted to afford it protection therefrom. Such a statute is clearly within the proper exercise of the police power of the state. Every one has the right to distinguish for himself what an article of food is, and have the means of judging for himself its quality and value. Palmer v. The State, 39 Ohio *90 St., 236. Powell v. Commonwealth, 114 Pa. St., 265; Powell v. Pennsylvania, 127 U. S., 678.
In Powell v. Commomwealth, the act of the legislature of Pennsylvania prohibiting the manufacture and sale of oleomargarine or keeping the product with intent to sell, was held to fall within the police power of the state — a power held to include the making of all “wholesome and reasonable” laws, not repugnant to the constitution, that the legislature majr judge to be for the good and welfare of the commonwealth and its people. It was offered on the trial of the case to show by experts that oleomargarine is a wholesome article of food. This was rejected. Error having been assigned as to this, the court said, “The mere fact that experts may pronounce a manufactured article, intended for food, to be wholesome or harmless, does not render it incompetent for the legislature to prohibit the manufacture and sale of the article. The test of the reasonableness of a police regulation, prohibiting the making and vending of a particular article of food, is not alone whether it is in part-unwholesome and injurious. If an article of food is of such a character that few persons will eat it, knowing its real character; if at the same time, it is of such a nature that it can be imposed upon the public as an article of food which is in common use, and against which there is no prejudice; and if, in addition to this, there is probable ground for believing- that the only way to protect the public from being- defrauded into the purchasing of the counterfeit article for the genuine, is to prohibit altogether the manufacture and sale of the former — then we think such a prohibition may stand as a reasonable police regulation, although the article prohibited is in fact innocuous, and al *91 though, its production might be found beneficial to the public, if in buying it they could distinguish it from the production of which it is the imitation. ’ ’ Citing State v. Addington, 77 Mo., 110. The case may be regarded as a somewhat extreme one; but it was affirmed on error by the supreme court of the United States in Powell v. Pennsylvania, supra; and is valuable as illustrating the extent of the power possessed by the legislature of a state over such subjects, when exercised to prevent deception and fraud in the manufacture and sale of an article of food. There can, as we think, be no question as to, the validity of our own statute to prevent the adulteration of vinegar. A statute of the state of New York, not only in substance but in language like our own, has recently been sustained by the court of appeals of that state. People v. Girard, 39 N. E. Rep., 823. In replying to the argument that the law is -an interference with a vested right, Pinch, J., in delivering the opinion .said, “Sometimes it — the argument — is pertinent and weighty, but in this case it is neither. It becomes the assertion of a vested right to color a food product so as to conceal or disguise its true or natural appearance; in plain words, a vested right to deceive the public.”

Judgment affimned.